## Gomer E. Highley v. The American Exchange Nat'l Bank.

1. MASTER IN CHANCERY—*Findings Conclusive.*—A master in chancery, seeing the witnesses, has better opportunities of determining the credibility of a witness than the Appellate Court. He can pass upon his manner of testifying, conduct upon the witness stand, apparent truthfulness, etc., which are matters incapable of review in this court.

2. WITNESS—*Effect of Testimony, Inherently Improbable.*—The testimony of an interested witness to facts inherently improbable, need not be accepted by court or jury, although such testimony is not contradicted by any other direct testimony in the case, and although the witness is not otherwise impeached.

**Bill for Relief.**—Appeal from the Superior Court of Cook County; the Hon. THEODORE BRENTANO, Judge, presiding. Heard in this court at the March term, 1899. Affirmed. Opinion filed November 27, 1899.

**Statement.**—The bill of complaint filed by appellee in this case seeks to compel the application of 308 shares of stock in the Mutual Fuel Gas Company upon a judgment in favor of appellee for $18,892.52, against Charles D. Hauk. Appellee seeks to reach this result in either one of two ways:

First.   The bill alleges that said shares were bought by appellee at sheriff's sale for $1,500, under an execution issued upon said judgment, and asks the court to compel a transfer of the shares to appellee.

Second.   The bill is as well, in effect, a general creditor's bill upon said judgment, and charges that defendants, or some of them, have property belonging to the judgment debtor which should be applied upon said judgment.

Hauk, the judgment debtor, who was co-defendant with appellant, Highley, the Illinois Trust & Savings Bank, and

others, was defaulted. Upon answer of appellant and replication, the cause was referred to a master in chancery to take proof and report the same, with conclusions. It appears from the master's report of evidence heard before him, that appellee recovered its judgment against Hauk on March 21, 1895, upon a promissory note made by Hauk, and dated May 6, 1893. That execution thereon issued March 21, 1895, and that upon the same day the sheriff undertook to levy upon all the shares and interest of Hauk as a stockholder in the Mutual Fuel Gas Company, by delivering an attested copy of the writ to the secretary of the corporation and demanding of him a certificate of the number of shares and amount of the interest of Hauk in the company. It appears that the secretary thereupon delivered to the sheriff a certificate, stating that sixty shares of the stock of the corporation stood in the name of Hauk upon the books of the corporation. The sheriff levied upon these sixty shares, and also upon all other shares and interest of said Hauk as a stockholder in the corporation. By virtue of the writ and levy the sheriff afterward sold at sheriff's sale the sixty shares of stock and "all other shares and interest" of said Hauk for $1,500, to appellee, applied the amount, less expenses of sale, upon the execution, and returned the execution unsatisfied as to the balance thereof. Notice of sale and demand for certificates of the sixty shares of stock were then served on the secretary of the corporation. It appears, also, that aside from the sixty shares of stock standing in the name of Hauk, there were 248 other shares of the capital stock of the corporation which were owned by Hauk and by him transferred to the Illinois Trust and Savings Bank, as collateral to secure an indebtedness of Hauk to the bank. That after the transfer by Hauk to this bank, the 248 shares had been changed into the form of trustee's certificates for the same amount of stock, under a certain trust agreement entered into by Hauk and other stockholders with Mitchell, Hamill and Willing as trustees. That the Illinois Trust & Savings Bank held the original 248 shares as collateral until Febru-

ary 6, 1894, and thereafter held the trustees' certificates for the same amount of stock, and for the same purpose, viz., as collateral.

The sixty shares of stock which remained in the name of Hauk upon the books of the company were so-called "additional stock," issued by resolution of the corporation of July 25, 1894, and sold to stockholders in amounts proportioned to their holdings of stock. It was by virtue of his ownership of the 248 shares that Hauk became entitled to purchase and did purchase the sixty shares. The certificate of the sixty shares also was given as additional collateral security to the Illinois Trust & Savings Bank by Hauk. The bank afterward sold all the 308 shares of said stock, and realized therefrom $55,440, which left, after paying the claims of the bank, the sum of $20,358.82, now in the hands of the bank. The controversy here is as to the right of appellee to that fund as the purchaser at sheriff's sale, or as the judgment creditor of Hauk. The Illinois Trust & Savings Bank make no claim to this fund, but hold it to abide the result of this suit. Hauk makes no claim to the fund, but is defaulted. Appellant, Highley, alone contests the right of appellee to the fund. He claims to have purchased the 248 shares of stock subject to the claim of the Illinois Trust & Savings Bank, in February, 1894, for $2,000, and to have thereafter, in September 1894, purchased the other sixty shares, subject to the same claim of the Illinois Trust & Savings Bank for $500, which sums of money he claims to have paid to Hauk. It appears also that Hauk was, and still is, indebted to appellant, Highley, in the sum of about $9,800. Highley does not, however, claim as a lienor, or otherwise, by reason of this debt, but as a *bona fide* purchaser for value, viz., for the $2,000 and the $500 alleged to have been paid by him to Hauk.

The sole controversy of fact presented is, did Highley purchase this stock as claimed by him? The master in chancery found that he did not, and recommended a decree for appellee. The chancellor overruled exceptions to the

master's report and decreed in conformity with the findings and recommendations of the master.

The decree, in effect, found that the 308 shares of stock in question were not the property of appellant, Highley, as claimed by him, that he had no interest in such shares, and that they were the property of the defendant, Hauk, subject to the claim of the Illinois Trust & Savings Bank, and the decree ordered that the Illinois Trust & Savings Bank, one of the defendants, pay to appellee the amount of $20,-353.82 held by it, and that appellant, Highley, pay costs.

From that decree this appeal is prosecuted.

Geo. S. Steere, attorney for appellant; H. W. Wakelee, of counsel.

Swift, Campbell & Jones, attorneys for appellee.

Mr. Presiding Justice Sears delivered the opinion of the court.

No one prosecutes the appeal here except Highley, and he bases his claim entirely upon the ground that the evidence establishes that he was a purchaser for value in February and September, 1894, before any right of appellee accrued, and hence that the decree is against the weight of the evidence.

Other questions are raised, as to the validity of the sheriff's levy and sale; as to the sufficiency of proof of the date of the origin of the claim of appellee upon which it obtained its judgment; and as to other property of the judgment debtor, Hauk, held by appellee.   But the question of fact first noted is determinative of the case.   There is no sufficient evidence in the record that appellee held other property of the judgment debtor when this bill was filed. The master's report declares that a certified copy of the note upon which judgment was obtained by appellee was introduced in evidence before him, and he reports in his findings that the note was dated May 6, 1893, before either of the alleged sales to appellant are claimed to have been

made. The validity of the sheriff's levy and sale, while presenting an interesting question, is not a matter necessary to be determined in this case, for if the decree is right in finding that appellant, Highley, did not purchase the stock and had no interest therein, then it is a matter of no consequence whether the sheriff's sale gave title or not. For in that event the decree would be warranted by the allegations of the bill and the evidence, as a decree subjecting this fund to the payment of the judgment debt. We proceed, therefore, to consider the sufficiency of the evidence to sustain the findings of the decree as to Highley's claim to the stock as a purchaser for value.

As before indicated, it is not contended by Highley that the alleged indebtedness of Hauk to him, to the amount of $9,800, was in any way the basis of the transfer of the stock claimed to have been made by Hauk to Highley. No other consideration for the transfer is relied upon save the alleged money payments of $2,000 in February, 1894, and $500 in September, 1894. Hauk was not called as a witness. Highley testified that Hauk was his brother-in-law, and resided with him when in Chicago; that no part of the indebtedness of Hauk to him (the $9,800) had been paid by transfer of the shares of stock; that the shares were not transferred to him in payment or security for any indebtedness, and that he purchased Hauk's equity in the 248 shares (subject to claim of Illinois Trust & Savings Bank), in February, 1894, for $2,000. His account of the transaction is as follows:

"I purchased Mr. Hauk's equity in 248 shares of that stock in February, 1894. Hauk owned 248 shares of the gas company's stock, which he hypothecated to the Illinois Trust & Savings Bank for a loan. He wanted some money and offered to sell me that stock subject to the indebtedness of the Illinois Trust & Savings Bank. I bought the stock of him, and paid him $2,000. I probably gave him a check for it; that is my recollection; it was my own check; was paid in the usual course of business by my bank, and returned to me in the usual course of business. I do not know what has become of it. I do not keep old checks or old papers; I usually destroy them after a year. To the

best of my knowledge and belief I have destroyed that check. I haven't the check book from which this check was drawn; I don't keep them; all matters are usually thrown away after the first year. To the best of my knowledge and belief I have destroyed that check book. I do not keep any account books for my private affairs. I have no account or memorandum or document of any kind showing the payment of that $2,000. The stock in which Hauk sold me his equity was then at the Illinois Trust & Savings Bank. I did not go to the bank before I made the purchase to ascertain whether the shares were there. The time I made the purchase I had no other knowledge on that point, except what I derived from Hauk. The time I purchased Hauk's equity I had an idea that the stock was worth approximately 115; it was not listed, so there was no market value. I knew nothing more about the terms of the pledge of those shares to the Illinois Trust & Savings Bank than what Hauk stated to me; he stated that he had borrowed something over $30,000 on the stock. My inducement for then purchasing the stock was that the man wanted to sell it, and I thought it was a good investment; that the stock was probably as low as it would be, and I thought in the future it would be worth more money. I have never received any document from Hauk showing the sale of his equity to me in those 248 shares, and I never paid him anything more for his 248 shares than that $2,000. Hauk was living with me at that time. This purchase of his equity in the 248 shares took place probably at my house; I don't remember distinctly now about the time and place. The matter first came up as a proposition from him to sell his equity in the stock to me. A day or so after, I offered him $2,000 for it; he asked a little more at the time he made the proposition. In the interim I made no inquiry of anybody about the value of the stock, but I knew of its value in a general way. I knew about the company, knew what its business consisted of, what kind of a plant they had, and about what business they were doing. I did not then know Hauk's financial condition; everything now looks as if he was insolvent at that time. I had not made any effort to collect the demand notes which I held against him (the $9,800). I knew he couldn't pay it at that time. I wrote to the bank to verify the truth of Hauk's statement that 248 shares of stock were deposited with the bank about a week or ten days after the purchase. I have no means of fixing the day of the month when this payment was made. I have not the statements of account returned

to me by the bank when they returned my checks. I went to the bank in the month of February with Mr. Hauk. I saw the president, Mr. Mitchell; I did not see the 248 shares of stock; did not attempt to see them. To get them transferred to my name on the books I asked Mr. Mitchell at my interview when I went there with Hauk to have the stock transferred; I did not request that it should be done at that time. Hauk and I went into the bank and met Mr. Mitchell, and Hauk told Mitchell that he had sold his equity in the stock to me. I did not at that time see the shares and did not talk about the number of shares with Mr. Mitchell. I took Hauk's statement as to the number of the shares. I don't remember that I asked to have the stock transferred at that interview with Mr. Mitchell when Mr. Hauk was with me in 1894; my statement to Mitchell at that time was that having purchased the equity in the stock I asked Mitchell if it was necessary to have the stock transferred now, and he said he would do it at any time we wanted it done, and I left the matter in that way. In pursuance of the talk had at that time the stock was transferred to my name early in 1895. I talked with Mitchell about the stock a great many times during the year. Was present at the bank when the stock was transferred to my name early in 1895. New certificates for 308 shares were issued in my name. I first saw the certificates in office of Henkle, secretary of the bank, when this transfer was made. I guess it was in March, 1895, probably about 10 A. M. Hauk was not with me.

"I paid $500 or $503 for the sixty shares in September, 1894. I paid for them by check directly to Hauk. The transaction was made at the Illinois Trust & Savings Bank. My recollection is I drew the money and gave Hauk the currency. I never have taken anything from Hauk to show my purchase. I gave notice to Mitchell, president of the Illinois Trust & Savings Bank, that I had purchased the equity and that the stock belonged to me, subject to the claim of the bank. It was two or three days after I purchased it. The notice to Mitchell was verbal. The sixty shares and the 248 shares were transferred to my name on books of the company March 19, 1895. I never saw any of the certificates till March 19, 1895. When I bought these sixty shares Hauk stated that his indebtedness to the bank had been increased $5,000, and was about $35,000. I never ascertained, except from Hauk's statement, the exact amount of his indebtedness to the bank when I bought the 248 shares. From February, 1894, I

have been making whatever payments have been made to the bank on Hauk's indebtedness. Have usually gone to the bank to pay this interest. The bank credited dividends on interest, and I paid balance of interest. I don't remember what the stock was worth at the time I bought the sixty shares for $500; the stock not having any value, I can't say I did know what it was worth, only approximately; my idea of the value of sixty shares was that they were not worth a great deal more than the other; I may at that time have had an idea that it was worth more than 115; I don't remember what my figures were at that time; I had an idea it was worth more than par at any rate. I do not know what this stock was worth in September, 1894, at the time I bought this sixty shares; from February, 1894, to September, 1894, I think the stock was paying from one and one-quarter to one and one-half dividends."

We have referred to the testimony of Highley thus at length because the case turns so largely upon his credibility as a witness and the weight to be given to this evidence.

The evidence which may be said to conflict with the testimony of Highley, consists, for the most part, of the actions and conduct of the parties, Hauk and Highley, after the date of the alleged sale, and the testimony of R. M. Orr, cashier of appellee. Orr testified positively that on March 19, 1895, he had conversations with Hauk and Highley in relation to the application of the equity of Hauk in these shares of stock upon the claim of appellee against Hauk, and that Highley then represented that he held the stock only as security for his claim of $9,800 against Hauk, and made no pretense to any claim as a purchaser. Highley denied that he had such conversation with Orr.

Upon this evidence the master in chancery and the chancellor concluded that Highley did not purchase the stock for value, as he asserted. The master in chancery had better opportunity for measuring the credit due to Highley's testimony than we have, for he saw the witness and could pass upon his manner of testifying, conduct upon the witness stand, apparent truthfulness, etc., which are matters incapable of review. We should, therefore, be loath to disturb the conclusions of fact reached by the master in chancery and approved by the chancellor, unless we could say that such

conclusions were manifestly against the weight of the evidence. After a careful examination of all the evidence, we are not able to hold that the master and the chancellor erred in this behalf. As to the weight to be accorded to a concurrence in conclusions of fact by master in chancery and chancellor, see Siegel v. Andrews, 181 Ill. 350.

There is much of inherent improbability in the testimony of Highley. The 248 shares of stock which Highley declares that he bought for $2,000, subject to the bank's claim, were then worth, at his own estimate, less than $30,000, and the bank's claim, upon which they were held as collateral, was more than $30,000, and Highley knew this. Therefore, if his statements be true, he gave $2,000 for that which was then worthless. When he claims to have paid $500 for sixty shares, also subject to the bank claim, the total of the value of the 308 shares at 115 was $35,420, and the bank's claim was then $35,000. In other words, he then gave $500 for what was worth at most $420, after having lost $2,000 in like manner by the purchase of the February proceeding. When it is considered that Highley was, as he claims, then a creditor of Hauk to the extent of $9,800, which he knew Hauk was unable to pay, the theory that he made these investments without inquiry and without any written evidence of the transaction is not credible. The testimony as to checks by which payment is said to have been made might not alone be sufficient ground for discrediting his testimony, but considered with all else in the testimony it certainly does not strengthen that testimony. After the time of the alleged sale of the 248 shares to Highley, it appears that Hauk exercised his right as owner of these shares to purchase his proportionate share of the additional stock, voted in July, 1895, of which the sixty shares here involved were a part. The time of the ostensible transfer of the stock from Hauk to Highley was very near to the time when appellee was seeking to obtain that stock for the payment of its claim, both being upon March 19, 1895.

The testimony of an interested witness to facts inher-

ently improbable need not be accepted by court or jury, although such testimony is not contradicted by any other direct testimony in the case, and although the witness is not otherwise impeached. Elwood v. Western U. T. Co., 45 N. Y. 549; Kavenagh v. Wilson, 70 N. Y. 177; Koehler v. Adler, 78 N. Y. 287; Quock Ting v. United States, 140 U. S. 417.

We think that the evidence warranted the court in finding that the conveyance of the shares of stock to Highley was merely colorable, and that he held them as a secret trust in favor of Hauk, the vendor, who was the debtor of appellee at the time of the alleged conveyance.

We are of opinion that the findings of the master in chancery and the decree of the court below were based upon a proper and just measurement of all the evidence in the case. The decree is affirmed.